FILED
99 DEC 29 PM 3: 24
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ENTERED
DEC 2 9 1999

CARL HARRIS,              )
                          )
            Plaintiff     )
                          )
vs.                       )   CASE NO. CV98-HGD-2196-S
                          )
FONTAINE FIFTH WHEEL COMPANY )
INC.,                     )
                          )
            Defendant     )

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant, Fontaine Fifth Wheel Company, Inc. (Fontaine) [Document #15]. The parties have submitted briefs and evidentiary materials in support of and in opposition to the motion. After consideration of all arguments and evidence, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Plaintiff, Carl Harris, a white male, began working for Fontaine in November 1992. He worked at defendant's Birmingham facility. Fontaine is in the business of manufacturing "fifth wheels," parts that connect a truck trailer to a truck cab. Plaintiff's final position prior to his termination was in final assembly.

36

Fontaine has a written attendance policy, which covers absences and leaving early without permission, also called job abandonment. The policy is contained in Fontaine's employee handbook and was set out in a separate notice to Fontaine employees dated November 3, 1997. A plant employee records his or her attendance by sliding a computerized badge or by punching a manual time card in and out of a time clock when entering and leaving the plant. At the beginning of each day, Melody McGinnis, Human Relations Assistant with the responsibility for maintaining attendance records, runs a computerized time card report for the previous day. The report identifies variances from the employees' work schedules, such as absences, late arrivals and early departures. For each variance, McGinnis checks with the employee's supervisor to determine whether there was any explanation for the variance. Each Monday, Ms. McGinnis runs a computerized time card report for the previous week, and each supervisor approves the time for each employee for whom the supervisor is responsible, marking and initialing any corrections by hand. McGinnis then manually enters the corrections and runs a final report. Ms. McGinnis also keeps an attendance record book based on the final reports, with a separate sheet for each employee.

Fontaine's employee handbook provides in pertinent part, "if you leave the plant at any time other than at lunch time, you must get permission from your foreman and then punch your card out." It also states "for production efficiency, you should not leave your job at times other than your designated lunch or break times without permission from your supervisor." In the Guidelines for Conduct portion of the handbook, employees are warned that "leaving work during work hours without prior authorization from management" can result in termination. The notice posted on November 3, 1997, states:

2

> If an individual gets sick or asks to leave early for personal reasons and the supervisor OK's it, then that incident will be treated based upon the attendance policy (0-7 minutes before scheduled shift end is a tardy, 8-59 minutes is a late and 60 minutes + is an occurrence).
>
> If an individual leaves early without talking to their supervisor and getting their OK, that incident will be considered to be job abandonment and subject to discharge. This includes scheduled overtime.
>
> \* \* \* \* \*
>
> **Leaving early without the OK of your supervisor will be considered to be walking off the job and result in termination.**
> [emphasis in original]

Plaintiff received and reviewed both the employee handbook and the November 3, 1997, notice.

During the week of February 2, 1998, defendant's Birmingham plant was working ten-hour shifts, with the exception of Friday, February 6, on which the employees worked an eight-hour shift. Randy Hazelrig told most of the plant employees to expect to work a ten-hour shift on Monday, February 9. However, Hazelrig did not inform Frank Toles, Felix Smith or Nathan Perry about the ten-hour shift. When these employees told Hazelrig on February 9 that they had made plans to work only an eight-hour shift that day, Hazelrig excused Toles, Smith and Perry from working more than an eight-hour shift on February 9. Plaintiff asked his supervisor why Toles, Smith and Perry were leaving early, and Hazelrig explained that he had not informed them the previous week about the ten-hour shift. Plaintiff was offered the chance to leave that day after eight hours but declined.

On February 16, 1998, plaintiff arrived at 5:52 a.m. and was scheduled to work a ten-hour shift, from 6:00 a.m. until 4:30 p.m. He left the facility at 4:20 p.m.[1] Prior to leaving early, plaintiff attempted but was unable to find Randy Hazelrig, his supervisor, to ask permission to leave before

---

[1] Evidence indicates that plaintiff left the plant with Cindy Nation, another employee and friend of plaintiff's, who had been told to leave the plant after being terminated for failing a drug test.

3

the end of his shift. Mr. Hazelrig and Andrew Freeland, the plant manager, were in a meeting in the training room or in Freeland's office. He therefore did not have permission to leave early either from Hazelrig or any other supervisor. The attendance record kept by Melody McGinnis shows that for February 16, 1998, plaintiff left between eight and 59 minutes before the end of his scheduled shift. He did not have his supervisor's approval to leave early. Plaintiff was aware that if he left early without permission, he would be subject to discharge. On February 17, 1998, plaintiff's attendance record shows that he called in sick and did not come to work.

When Fontaine determined that Harris left early on February 16, he was suspended. The attendance record for February 18, 1998, indicates he was suspended on that date. As soon as plaintiff arrived at the plant on February 18, Randy Hazelrig called him into a meeting with the plant manager, Andrew Freeland. After admitting to Freeland that he left early without permission and that he was aware he violated company policy, plaintiff was sent home. The following day, plaintiff called Thomas Powell, Fontaine's Director of Human Resources, to report that Felix Smith, Frank Toles and Nathan Perry had left early on February 9, and Don Snow and Len Holloway had left work after eight hours, but were not disciplined. Mr. Harris also told Mr. Powell that Mr. Hazelrig had found Mr. Perry asleep in a safety meeting on February 9 and had to awaken him.

After a more complete investigation into the facts surrounding plaintiff's early departure, it was decided by Powell that plaintiff should be terminated. Prior to making that decision, Mr. Powell spoke with Randy Hazelrig or Andrew Freeland. Powell was advised that plaintiff did not have his supervisor's permission to leave early on February 16. Powell also investigated plaintiff's assertion that black employees had left early without being disciplined. He determined that Frank Toles, Felix Smith and Nathan Perry had received permission from Randy Hazelrig, their supervisor, to leave

4

work on February 9 after eight hours instead of ten because Hazelrig had not told these employees the shift would be extended to ten hours that day. Tom O'Donnell, the supervisor for Don Snow and Len Holloway, gave permission to Snow and Holloway to leave work before their ten-hour shift on February 16 ended because O'Donnell had run out of work for them to do. Mr. Hazelrig reported that he had asked Nathan Perry if he had been asleep in the meeting but Perry had denied it. Hazelrig also had been told an employee named Tony Alexander was asleep in the paint room, but when he entered the paint room, he found Alexander awake. Mr. Powell also asked Ms. McGinnis to review Fontaine's records to determine if any other employees had left work early without supervisory approval yet were not terminated. Ms. McGinnis was unable to find records indicating any other employee violated the policy but was retained. Any employees who left early but were not fired first obtained the permission of their supervisors to leave. Plaintiff was officially terminated from his employment on February 20, 1998.

According to defendant's records, other employees have been terminated for job abandonment or were considered to have voluntarily resigned after walking off the job and never returning. These employees are Bruce Bailey, Tracy Church, Bobby Jackson and Claude Thomas (white males), and Chester Colston and Jerome Raines (black males).

Plaintiff asserts that Sharon Blackman, a black female employee, left work early without permission but was not disciplined or terminated. According to the affidavit of Cindy Nation, in the fall of 1997, Ms. Blackman clocked out at the end of eight hours (during a ten-hour work shift) and left early, without first obtaining the permission of Randy Hazelrig, her supervisor. Blackman was not terminated. Defendant contends that Nation's affidavit is not competent evidence because it does not affirmatively show that she has personal knowledge of the averments contained in her affidavit

5

about when Blackman clocked out, whether she had permission to do so, and Hazelrig's knowledge. Defendant has provided the affidavits of both Sharon Blackman and Randy Hazelrig. In her affidavit, Ms. Blackman affirmatively states that she has never left work early without permission from her supervisor. Whenever she has left work early, she always has obtained advance approval from her supervisor. Randy Hazelrig states in his affidavit that whenever Sharon Blackman has left work before the end of her shift, she first has sought and obtained his permission. While plaintiff claims that the affidavit of Cindy Nation to the contrary creates an issue of fact whether Ms. Blackman left early without permission, it is clear that the affidavits of Blackman and Hazelrig, regarding their own actions about which they have first-hand knowledge, are entitled to such weight that Ms. Nation's affidavit can be disregarded.[2] The court finds that Sharon Blackman has not left work early without first getting permission to do so from her supervisor.

Mr. Harris filed the complaint in this action on August 28, 1998. He alleged that defendant engaged in reverse discrimination against him on the basis of his race in that he was terminated for allegedly violating the job abandonment policy while similarly situated black employees were not. He asserts causes of action pursuant to Title VII and 42 U.S.C. § 1981.

### THE MOTION FOR SUMMARY JUDGMENT

Defendant asserts in its motion for summary judgment that plaintiff violated Fontaine's job abandonment policy, a policy of which plaintiff was aware, and was terminated for that reason.

---

[2] *See Lupo v. Wyeth-Ayerst Laboratories*, 4 F.Supp.2d 642 (E.D.Tex. 1997) (court may infer personal knowledge from affidavit itself, but need not do so when other evidence indicates affiant has no personal connection to subject matter or there is other evidence suggesting that he or she likely did not have or could not have personal knowledge of it).

6

Fontaine also contends that it has applied the job abandonment policy consistently without regard to race, and that it has fired both black and white employees for violating the policy. Defendant argues that plaintiff cannot establish a *prima facie* case of race discrimination because he cannot demonstrate that he was qualified for the position he held (on account of his violation of the attendance policy) and cannot establish that black employees were treated more favorably with respect to the policy. Defendant also contends that it has articulated a legitimate business reason for plaintiff's termination that cannot be shown by plaintiff to be a pretext for reverse discrimination.

Plaintiff contends that he has raised a genuine issue of material fact with regard to the uniformity of defendant's application of its job abandonment rule. He relies on the affidavit of Cindy Nation to support his assertion that one black employee, Sharon Blackman, was not terminated for leaving early without permission. He also contends that the records for Bruce Bailey, Tracy Church, Bobby Jackson, Claude Thomas, Chester Colston and Jerome Raines, showing these employees "voluntarily resigned" rather than being terminated for job abandonment, are evidence of pretext.

Defendant asserts that other records in the files of Bruce Bailey, Tracy Church, Bobby Jackson, Claude Thomas, Chester Colston and Jerome Raines show these employees are considered by defendant to have been discharged as a disciplinary measure for violating the work rule against leaving early without permission. Fontaine further argues that plaintiff cannot rely on the affidavit of Cindy Nation to establish a *prima facie* case because it is not competent evidence and thus is not entitled to argue pretext.

7

## DISCUSSION

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden or proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court that the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

8

could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

Title 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

The elements and proof for a cause of action under § 1981 are identical to the elements of a Title VII claim. *Walters v. Atlanta*, 803 F.2d 1135 (11th Cir. 1986).

A plaintiff may prove he was discriminated against on the basis of his race in an employment decision by direct evidence, circumstantial evidence, or statistical proof. Even if a Title VII plaintiff does not present direct evidence of discrimination, he may nevertheless present sufficient circumstantial evidence of discrimination to create a jury question. In evaluating claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp, supra,* and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L Ed. 2d 207 (1981). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S.

9

at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n. 6, 101 S. Ct. at 1093-94 & n. 6. Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094. To satisfy the burden of production, the defendant need not persuade the court that it was actually motivated by the proffered reasons, but only need raise a genuine issue of fact as to whether it discriminated against the plaintiff. The employer need only produce admissible evidence which would allow the trier of fact rationally to conclude the employment decision was not motivated by a discriminatory animus. *Burdine*, 450 U.S. at 254-55, 257, 101 S. Ct. at 1094, 1096. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S. Ct. at 1095. If he is to prevail, the plaintiff then must establish that the employer's articulated reason was a pretext for discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825; *Chaney v. Southern Railway Co.*, 847 F.2d 718, 722 (11th Cir. 1988); *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir. 1985). Throughout the proceeding, the plaintiff retains the ultimate burden of proving by a preponderance of the evidence the existence of purposeful discrimination. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984) ("The 'ultimate question' in a disparate treatment case is not whether the plaintiff

10

established a *prima facie* case or demonstrated pretext, but 'whether the defendant intentionally discriminated against the plaintiff.'") (quoting *Aikens*, 460 U.S. at 714-15, 103 S.Ct. at 1481-82).

Although the *McDonnell Douglas prima facie* model initially was developed in the context of a discriminatory hiring claim, the purpose underlying that method of analysis–to focus the inquiry by eliminating "the most common nondiscriminatory reasons" for the employer's action, *see Burdine*, 450 U.S. at 253-54, 101 S.Ct. at 1093-94; *Nix*, 738 F.2d at 1184–retains equal validity where discriminatory discipline is alleged.

*Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989).

The Eleventh Circuit has stated that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. *Id. See also Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1984) (plaintiff alleging disparate disciplinary treatment makes out *prima facie* case of discrimination "upon a showing (1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person."); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 915 (8th Cir. 1986) ("To establish a *prima facie* case, [plaintiff] had to show that he is a member of a protected class, that he was disciplined, and that the discipline imposed was harsher than that imposed on comparably situated whites."). *Cf. Nix v. WLCY Radio/Rahall Communications*, 738 F.2d at 1185 ("a plaintiff fired for misconduct makes out a

11

*prima facie* case of discriminatory discharge if he shows that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'") (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1981)); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980) ("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.").

In this case, plaintiff has not made out a *prima facie* case of discriminatory application by defendant of its work rules and discipline for violation of those rules. While he has shown that he engaged in the same conduct as some black employees of defendant (leaving work early without permission), he has not established that the black employees were retained by defendant while he was discharged. Instead, the evidence shows that other black and white employees who left work early without supervisory approval, in violation of published company policy, also were terminated from employment.

Plaintiff asserts that the records for the black employees in question, Chester Colston and Jerome Raines, reflect that they voluntarily resigned rather than being fired. Interestingly enough, plaintiff also makes the same assertion with regard to the white employees he cites as comparators, Bruce Bailey, Tracy Church, Bobby Jackson, and Claude Thomas. This is evidence that would be to defendant's benefit, rather than plaintiff's, in that it would tend to show that white employees and black employees in the same situation were treated the same by defendant.

12

A review of the records of these comparators[3] shows that on the Personnel Action Authorization form, a computerized printout, the reason for termination listed for Claude Thomas is "voluntary quit." However, the handwritten Termination of Employment form shows the reason for termination to be "walked off of job." For David Bailey, the Personnel Action Authorization form shows "voluntary quit," but the Termination of Employment form shows "voluntary quit--walked off job." Tracy Church's forms show "resigned--walked off job" and "job abandonment." Bobby Jackson's reason for termination is shown as "voluntarily quit--walked off job" on the computerized form and "walked out" on the written form. Chester Colston's Personnel Action Authorization form shows he "voluntarily quit--walked off job," and the Employee Disciplinary Action Report reads:

> Chester Colston has been discharged for the following: Chester Colston left premises without proper notification to supervisor/ leadman on 11-30-92, or authorization to do so.

The disciplinary action listed for the offense is "discharge." Jerome Raines' reason for termination is shown as "voluntary quit," but he is shown as not being eligible for rehire. On the Employee Disciplinary Action Report, it is written "walked off of job . . ." and the indicated discipline is "discharge."

These records do not support plaintiff's claim that he, as a white employee, was treated differently from black employees who left early without permission. In fact, the records show clearly that employees walking off the job without permission are terminated by defendant, without regard to their race.

---

[3] These records are attachments to Exhibit B of Plaintiff's Evidence in Opposition to Defendant's Motion for Summary Judgment [Doc. #21].

13

Because plaintiff has failed to establish a *prima facie* case of reverse discrimination, the court finds and determines that defendant's motion for summary judgment is due to be granted and this action dismissed with prejudice. A separate order in conformity with this memorandum opinion shall be entered contemporaneously herewith.

DONE this 29th day of December, 1999.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

14